No. 23-13249

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

OLIVIA COLEY-PEARSON,
*Plaintiff/Appellant*,

v.

COFFEE COUNTY, and
EMILY "MISTY" MARTIN
*Defendants/Appellees.*

———————————

Appeal From United States District Court
Southern District of Georgia
Case No. 5:20-cv-00151-LGW-BWC

———————————

**APPELLANT OLIVIA COLEY-PEARSON'S BRIEF**

———————————

Gerry Weber
Law Offices of Gerry Weber, LLC
PO Box 5391
Atlanta, GA 31107
404-522-0507
wgerryweber@gmail.com

Mark Loudon-Brown
Southern Center for Human Rights
60 Walton Street NW
Atlanta, GA 30303
404-688-1202
mloudonbrown@schr.org

Zack Greenamyre
Vanessa Carroll
Mitchell Shapiro Greenamyre & Funt LLP
881 Piedmont Avenue
Atlanta, GA 30309
404-812-4747
zack@mitchellshapiro.com
vjcarroll@gmail.com

*Counsel for Appellant*

January 26, 2024

## APPELLANT'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Counsel hereby certifies that the following is a complete list of all persons and entities that have an interest in the outcome of this case or appeal:

1. Brown, Readdick, Bumgartner, Carter, Strickland & Watkins, LLP (counsel for Appellees);

2. Carroll, Vanessa (counsel for Appellant);

3. Chaney, Eric (former member, Coffee County Board of Elections);

4. Coley-Pearson, Olivia (Appellant);

5. Cutting, Jeremy (former counsel for Appellant);

6. Greenamyre, Zack (counsel for Appellant);

7. Law Offices of Gerry Weber, LLC (counsel for Appellant);

8. Loudon-Brown, Mark (counsel for Appellant);

9. Martin, Emily Misty (Appellee);

10. McCullough, Matthew (member, Coffee County Board of Elections);

11. McDuffie, Eliza (former counsel for Appellant)

12. Mitchell Shapiro Greenamyre & Funt, LLP (counsel for Appellant);

13. Perkins, Ben (attorney for Coffee County Board of Elections);

14. Roberts, Rachel (member, Coffee County Board of Elections);

15. Rowell, Tony (former attorney for Coffee County Board of Elections);

16.     Scott, Paula (member, Coffee County Board of Elections);

17.     Southern Center for Human Rights (counsel for Appellant);

18.     Stone, Wendell (chair, Coffee County Board of Elections);

19.     Strickland, Richard (counsel for Appellee);

20.     Szokoly, Amanda (counsel for Appellee);

21.     Thomas, Andy (member, Coffee County Board of Elections)

22.     Thomas-Clarke, Ernestine (member, Coffee County Board of Elections);

23.     Watkins, Bradley (counsel for Appellee);

24.     Weber, Gerry (counsel for Appellant);

25.     Wood, the Honorable Lisa Godby (United States District Judge, pretrial proceedings).

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Respectfully submitted,

/s/ *Gerald Weber*
Gerald Weber
Georgia Bar No. 744878

January 26, 2024

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant believes oral argument will be of assistance to the Court (1) to address the implications of an intervening decision from this Circuit that directly addresses the constitutionality of broad criminal trespass bans such as the one issued here, (2) to aid this Court in analyzing the municipal liability theory raised below but never discussed by the district court, and (3) to pinpoint how the district court's order failed to credit, or cite, key testimony on issues of constitutionality and causation.

## <u>TABLE OF CONTENTS</u>

Certificate of Interested Persons and Corporate Disclosure Statement ......... C-1

Statement Regarding Oral Argument ..................................................................... i

Table of Authorities ........................................................................................... iv

Jurisdiction .......................................................................................................... 1

Standard of Review ............................................................................................. 2

Issues Presented .................................................................................................. 2

Statement of The Case ........................................................................................ 3

    *A. Statement of Facts* ................................................................................. 3

    *B. Procedural History* ............................................................................. 10

Summary of the Argument ................................................................................ 11

Argument ........................................................................................................... 13

  I. THE CRIMINAL TRESPASS BAN IS FACIALLY
    UNCONSTITUTIONAL IN ITS TEMPORAL AND GEOGRAPHIC
    SCOPE, AND AS APPLIED BECAUSE IT WAS UNREASONABLE
    AND NOT VIEWPOINT NEUTRAL ........................................................ 13

    A. The Criminal Trespass Ban is Facially Unconstitutional .............. 13

        1. The Ban's temporal and geographic scope extended far
        beyond polling places ........................................................................ 13

        2. The Ban was unreasonable and not narrowly tailored .......... 15

        3. The Criminal Trespass Ban Lacked Objective Standards for
        Enforcement ...................................................................................... 21

        4. The Criminal Trespass Ban is an Unlawful Prior Restraint .. 24

    B. Jurors Could Find The Criminal Trespass Ban Was Neither
    Reasonable Nor Viewpoint Neutral .................................................. 26

        1. The Ban was not viewpoint neutral ........................................... 27

        2. The Criminal Trespass Ban was not reasonable ...................... 32

  II. A JURY MUST RESOLVE DAMAGES CLAIMS AGAINST
    DEFENDANTS ........................................................................................... 35

**A. A reasonable jury would find Coffee County caused the Criminal Trespass Ban, which was the sole basis for the arrest**................... 35

    **1. The Coffee County Elections Supervisor was the delegated final policymaker for trespass bans *and* the Criminal Trespass Ban was Officially Promulgated Coffee County Policy** ................................................................................ 37

    **2. The Policy Decisions to Issue the Ban was Not Subject to Review by the County Board of Elections or the County Commission** .................................................................... 41

    **3. The Trespass Ban Was the "Moving Force" in the Resulting Arrest** ........................................................................ 45

**B. A Reasonable Jury Could Find that Martin Caused Coley-Pearson's Unlawful Arrest** ................................................ 48

    **1. The district court improperly decided proximate cause as a matter of law as to Martin** .......................................... 48

    **2. Martin is Not Entitled to Qualified Immunity** ........................ 52

Conclusion............................................................................................ 55

Certificate of Compliance .................................................................. 56

Certificate of Service ......................................................................... 57

# <u>TABLE OF AUTHORITIES</u>

## <u>Federal Cases</u>

*Amnesty American v. Town of West Hartford*,
  361 F.3d 113 (2d Cir. 2004) ............................................................. 46

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................ 27

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*,
  564 U.S. 721 (2011) ........................................................................ 17

*Barnett v. MacArthur*,
  956 F.3d 1291 (11th Cir. 2020) ....................................................... 47

*Barrett v. Walker Cty. Sch. Dist.*,
  872 F.3d 1209 (11th Cir. 2017) ............................................. 22, 25, 53

*Bd. of Comm'rs of Bryan Cty. v. Brown*,
  520 U.S. 397 (1997) .................................................................. 1, 41, 55

*Blue v. Lopez*,
  901 F.3d 1352 (11th Cir. 2018) ....................................................... 45

*Bourgeois v. Peters*,
  387 F.3d 1303 (11th Cir. 2004) .................................................. passim

*Burk v. Augusta-Richmond Cty.*,
  365 F.3d 1247 (11th Cir. 2004) ....................................................... 22

*Burson v. Freeman*,
  504 U.S. 191 (1992) ............................................................ 16, 21, 54

*Cambridge Christian Sch. Inc. v. FHSAA*,
  942 F.3d 1215 (11th Cir. 2019) ....................................................... 17

*Cash v. County of Erie*,
     654 F.3d 324 (2nd Cir. 2011) ......................................................................... 46

*Catron v. City of St. Petersburg*,
     658 F3d. 1260 (11th Cir. 2011) .................................................................... 18

*CBS Broad., Inc. v. Cobb*,
     470 F. Supp. 2d 1365 (S.D. Fla. 2006) .......................................................... 16

*Citizens for Police Accountability Pol. Comm. v. Browning*,
     572 F.3d 1213 (11th Cir. 2009) .................................................................... 16

*City of St. Louis v. Prapotnick*,
     485 U.S. 112 (1988) .......................................................................................... 41

*Conn v. City of Reno*,
     591 F.3d 1081 (9th 2010) ................................................................................ 46

*Cooper v. Dillon*,
     403 F.3d 1208 (11th Cir. 2005) .................................................................... 47

*Cornelius v. NAACP*,
     473 U.S. 788 (1985) .......................................................................................... 28

*Crowder v. Housing Authority of the City of Atlanta*,
     990 F.2d 586 (11th Cir. 1993) ............................................... 19, 20, 21, 54

*Cyr v. Addison Rutland Supervisory Union*,
     60 F. Supp. 3d 536 (D. Vt. 2014) ................................................................ 21

*FW/PBS, Inc. v. City of Dallas*,
     493 U.S. 215 (1990) .......................................................................................... 24

*Gutierrez-Rodriguez v. Cartagena*,
     882 F.2d 553 (1st Cir. 1989) .......................................................................... 46

*Harper v. City of Los Angeles*,
     533 F. 3d 1010 (9th Cir. 2008) .................................................................... 46

*Harrigan v. Metro Dade Police Dep't No. 4,*
    977 F.3d 1185 (11th Cir. 2020) ..................................................................... 2

*Hill v. Clifton,*
    74 F.3d 1150 (11th Cir. 1996) .......................................................5, 6, 33, 42

*Holloman ex rel. Holloman v. Harland,*
    370 F.3d 1252 (11th Cir. 2004) ................................................42, 44, 53, 54

*Huminski v. Corsones,*
    396 F.3d 53 (2d Cir. 2005) ........................................................................... 20

*Jackson v. Sauls,*
    206 F.3d 1156 (11th Cir. 2000) .............................................................50, 51

*Jordan v. Mosley,*
    487 F.3d 1350 (11th Cir. 2007) ................................................................... 38

*Malley v. Briggs,*
    475 U.S. 335 (1986) ...................................................................................... 45

*Mama Bears of Forsyth Cty. v. McCall,*
    2022 WL 1811026 (N.D. Ga. Nov. 16, 2022)............................................. 21

*Mandel v. Doe,*
    888 F.2d 783 (11th Cir. 1989) ....................................................35, 39, 40, 41

*Martinez v. City of Opa-Locka,*
    971 F.2d 708 (11th Cir. 1992) .................................................................37, 42

*McBreairty v. Sch. Bd. of RSU 22,*
    2022 WL 2835458 (D. Me. July 20, 2022) .................................................. 21

*McDonough v. Garcia,*
    No. 22-11421, 2024 WL 106093, *2 (11th Cir. Jan. 10, 2024) ............................passim

*McMillian v. Johnson*,
   88 F.3d 1573 (11th Cir. 1996) ................................................ 36, 37

*Minnesota Voters Alliance v. Mansky*,
   138 S.Ct. 1876 (2018) ................................................ 16, 17, 54

*Monell v. Dept. of Social Services*,
   436 U.S. 658 (1978) ................................................ passim

*Monroe v. Pape,*
   365 U.S. 167 (1961) ................................................ 45

*Naturists Society, Inc. v. Fillyaw*
   958 F.2d 1515 (11th Cir. 1992) ................................................ 16

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 539 (1976) ................................................ 25

*Niemotko v. Maryland*,
   340 U.S. 268 (1951) ................................................ 22

*Org. for a Better Austin v. Keefe*,
   402 U.S. 415 (1971) ................................................ 25

*Pembaur v. City of Cincinnati*,
   475 U.S. 469 (1986) ................................................ 36, 37, 40

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
   460 U.S. 37 (1983) ................................................ 17

*Polaris Amphitheater Concerts, Inc. v. City of Westerville*,
   267 F.3d 503 (6th Cir. 2001) ................................................ 26

*Pyles v. Fahim*,
   771 F.3d 403 (7th Cir. 2014) ................................................ 46

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015) ................................................ 17, 27

*Ridley v. Mass. Bay Transp. Auth.*,
    390 F.3d 65 (1st Cir. 2004) ........................................................... 27

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ............................................................... 27, 53

*Sanders v. Lull Intern., Inc.*,
    411 F.3d 1266 (11th Cir. 2005) .................................................. 49, 50

*Scala v. City of Winter Park,*
    116 F.3d 1396 (11th Cir. 1997) .......................................................... 41

*Scott v. Harris*,
    550 U.S. 372 (2007) .......................................................................... 50

*Sentinel Comms. Co. v. Watts*,
    936 F.3d 1189 (11th Cir. 1991) ........................................................ 24

*Smith v. District of Columbia*,
    413 F.3d. 86 (D.C. Cir. 2005) ...................................................... 48, 49

*Southeastern Promotions v. Conrad*,
    420 U.S. 557 (1975) .......................................................................... 25

*Tolan v. Cotton*,
    572 U.S. 650 (2014) ............................................................... 27, 29, 55

*Troupe v. Sarasota Cnty., Fla.*,
    419 F.3d 1160 (11th Cir. 2005) ......................................................... 12

*United States v. Fransden*,
    212 F.3d 1231 (11th Cir. 2000) ......................................................... 16

*Universal Amusement Co. v. Vance*,
    587 F.2d 159 (5th Cir. 1978), *aff'd* 445 U.S. 308 (1980) .............. 26

*Warner v. Orange County Dept. of Probation,*
  115 F.3d 1068 (2nd Cir. 1997) ....................................................... 46

*Williams v. Fulton Cty. Sch. Dist.,*
  181 F.Supp. 3d 1089 (N.D. Ga. 2016) ........................................... 44

*Willingham v. City of Valparaiso, Florida,*
  638 Fed. Appx. 903 (11th Cir. 2016) ........................................42, 43, 44, 48

## State Cases

*Langton v. State,*
  261 Ga. 878 (1992) ....................................................................... 16

*Ontario Sewing Mach. v. Smith,*
  572 S.E.2d 533 (Ga. 2002) ........................................................... 49

*State v. Trump,*
  23SC188947 (Fulton Super. Ct. Aug. 14, 2023) ............................. 30

## Statutes and Rules

28 U.S.C. § 1291 ............................................................................... 1

28 U.S.C. § 1331 ............................................................................... 1

42 U.S.C. § 1983 ............................................................................... 1

O.C.G.A. § 21-2-385 ........................................................................ 15

## <u>JURISDICTION</u>

This case asserts violations of the First, Fourth, and Fourteenth Amendments under 42 U.S.C. § 1983.  The district court had jurisdiction under 28 U.S.C. § 1331.  This Court has jurisdiction under 28 U.S.C. § 1291.

This is a direct appeal from the district court's order granting Defendants' motion for summary judgment.  Doc. 106.  The district court entered final judgment in Defendants' favor on September 5, 2023.  Doc. 107.  Plaintiff timely filed her notice of appeal on October 3, 2024.  Doc. 110.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo, drawing all facts and inferences in the light most favorable to the nonmovant. *Harrigan v. Metro Dade Police Dep't No. 4*, 977 F.3d 1185, 1192 (11th Cir. 2020).

## ISSUES PRESENTED

1.      Whether the district court erred in holding that the broad Criminal Trespass Ban was not unconstitutional on its face or as applied to Plaintiff-Appellant Olivia Coley-Pearson.

2.      Whether the district court erred in holding that Coffee County was not liable for the Criminal Trespass Ban or Coley-Pearson's subsequent arrest and prosecution when it delegated final policymaking authority regarding the Ban through a vote of a quorum of the members of the Board of Elections on the advice of the County Attorney.

3.      Whether the district court erred in holding that no reasonable jury could find Defendants proximately caused the unlawful Criminal Trespass Ban or Coley-Pearson's arrest for resisting the Ban.

2

## STATEMENT OF THE CASE

### A.    Statement of Facts

Plaintiff Olivia Coley-Pearson is a lifelong resident of Coffee County, Georgia, and the first Black woman elected to the Board of Commissioners for the City of Douglas.  Doc. 53 ¶¶ 1, 12; Doc. 84-2 ¶ 2.  In addition to serving the City of Douglas as a Commissioner for nearly 25 years, Coley-Pearson is also an outspoken advocate for civil rights, especially voting rights, and has dedicated her life to "increasing voter turnout and participation to ensure that the voting rights victories of the Civil Rights Era are fully realized" in Coffee County.  Doc. 84-2 ¶ 4.  Coley-Pearson has expressed her commitment to voting rights by encouraging everyone in her community to vote, conducting voter registration drives, providing transportation to and from polling places, and assisting illiterate and disabled voters with the act of voting.  *Id.* at ¶¶ 7–10; *see also* Coley-Pearson Dep. 81:19-25, 132:24-25, 135:1-8, 201:5-11; Martin Dep. 55:13-25, 56:1-13.

Coley-Pearson has engaged in this work for decades because she believes it is important to communicate to historically disenfranchised people "that their voices and votes matter," and because she believes in the importance of showing elected officials that these same people "are active voters whose needs and interests must be represented in the democratic process[.]"  *Id.* at ¶ 10.  Indeed, Coley-Pearson is well-known in her community as a strong and outspoken

advocate for voting rights and increased voter participation. *See* Nesmith Dep. 14:-7-11, 16:4-11; Martin Dep. 30:10-17, 55:13-18; Stewart Dep. 40:8-25, 41:1-17.

Coley-Pearson's voting advocacy has at times been met with significant resistance in Coffee County. After the November 2012 election, the Coffee County Board of Elections ("Board") reported Coley-Pearson to the Secretary of State because they noticed "multiple people assisting multiple voters." Doc. 84-5 at 11. According to Defendant Emily Misty Martin, who was then working as a clerk for the Board, *see* Doc. 84-5 at 10, the number of voters receiving assistance "threw up a red flag." *Id.* at 11. The Coffee County District Attorney indicted Coley-Pearson on four felony counts for allegedly improperly assisting voters in the 2012 election. Doc. 53 ¶ 12; Doc. 84-6; Martin Dep. 40:7-41:23. Martin signed the indictment as "Prosecutor," Doc. 84-6 at 2, testified against Coley-Pearson, and sat at counsel table with the District Attorney for the 2017 trial. Martin Dep. 16:20-25, 17:1-12, 44:14-25, 45:1-7; Coley-Pearson Dep. 27:23-25, 28:1-9; Doc. 84-5 at 8-36. The case ended in a mistrial due to a hung jury. Doc. 53 ¶ 13. When the District Attorney retried Coley-Pearson in 2018, the jury acquitted in approximately 20 minutes. Doc. 53 ¶ 13.[1]

---

[1] Martin did not testify at the second trial in part because, according to a *Brady* disclosure, Martin's employer, Coffee County, had reprimanded her for falsifying documents. Doc. 53 ¶ 13; Martin Dep. 46:13-14, 47:13-48:13.

Although Coley-Pearson was acquitted of all wrongdoing, Martin and others in Coffee County continued to look for ways to have Coley-Pearson punished for her voting rights work. For instance, Martin, who became Coffee County's Elections Supervisor around 2018, Martin Dep. 28:1-3, continued to scrutinize Coley-Pearson's advocacy and sent information to the District Attorney and Secretary of State's Office suggesting that Coley-Pearson had violated the law by offering to help a woman change her husband's address at a voter registration drive. Doc. 53 ¶¶ 28-29; Doc. 84-8; Martin Dep. 104:25-108:6. And in 2021, Cathy Latham, then Chair of the Coffee County Republican Party, created a Facebook video condemning Coley-Pearson for providing food and other assistance to voters. Doc. 84-7.

Martin's antipathy for Coley-Pearson's voting rights work came to a head during the early voting period of the 2020 general election. On October 27, 2020, Coley-Pearson took Crystal Hill, a voter who has difficulty reading, to the Board of Elections. Doc. 84-2 ¶ 11; Hill Dep. 7:7-9; Pearson Dep. 33:22-34:4, 34:18-21, 39:12-19. Coley-Pearson assisted Hill with voting, and before Hill ran her ballot through the scanner, Coley-Pearson asked an elections worker to explain the purpose of the buttons on the ballot scanner because the scanners were new that year. Doc. 84-2 ¶ 12; Coley-Pearson Dep. 39:20-25; Hill Dep. 22:20-25; Martin

Dep. 60:1-8.  Coley-Pearson did not raise her voice or touch the buttons on the

scanner.  Coley-Pearson Dep. 59:20-24; Hill Dep. 22:20-25, 25:8-20.

Just as Coley-Pearson inquired about the buttons, Martin began yelling at

Coley-Pearson.  Coley-Pearson Dep. 40:14-22, 45:13-46:3; Hill Dep. 22-25, 46:17-

19.  Although Coley-Pearson never touched the buttons, Martin continued to

holler and scream at Coley-Pearson, Coley Pearson Dep. 46:3-13, and when she

inquired why Martin, as the Elections Supervisor, did not know the purpose of

the buttons, Martin yelled out for someone to call 911.  Coley-Pearson Dep. 46:13-

17, 77:11-17; Hill Dep. 22:20-25, 24:22-24.  Because Hill had finished voting,

Coley-Pearson decided to leave the building, but Martin followed Coley-Pearson

towards the exit "screaming steadily" at Coley-Pearson, Coley-Pearson Dep. 46:

18-20, and yelled that Coley-Pearson had done the same thing (helping a voter)

that got her "in trouble" before.  Coley-Pearson Dep. 77:17-20; 101:18-19, 111:4-8;

Hill Dep. 26:20-27:5.  At that point, as she was leaving, Coley-Pearson raised her

voice to protest that Martin was once again lying about Coley-Pearson's conduct

to law enforcement.  Coley-Pearson Dep. 22-47:21; Hill Dep. 26:20-27:5.  Coley-

Pearson raised her voice only once, *after* Martin had yelled several times, and

never to the same level or degree as Martin.  Coley-Pearson Dep. 46:11-47:21,

51:5-6; Hill Dep. 25:8-9, 46:17-19.  She then exited the Board of Elections building.

Coley-Pearson Dep. 47:3-4, 21; Hill Dep. 26:5-16.

After Coley-Pearson left, Sergeant Joe Stewart, from the City of Douglas Police Department, arrived in response to Martin's 911 call.  Doc 69-4; Doc. 69-5; Martin Dep. 63:14-19.  Martin told Stewart she did not want Coley-Pearson to assist other voters. Doc. 84-4 at 18:30-19:00.  She also told Stewart she wanted Coley-Pearson to be indefinitely banned from all voting areas.  *Id.* at 9:55-10:05. Martin also told Stewart that she would say that she felt threatened if that was necessary to ban Coley-Pearson.  *Id.* at 9:55-10:05. Video captured her saying she would do "whatever she has to do to keep [Coley-Pearson] out of this building." *Id.* at 18:30-19:00.

After discussing a trespass ban with Stewart, Martin contacted the Coffee County Attorney, Tony Rowell, to obtain approval to have Coley-Pearson banned.  Doc. 69-15 at 2; Martin Dep. 82:13-83:14.  Upon Rowell's advice, Martin polled a quorum of the Board of Elections on whether she had the authority to ban Coley-Pearson.  Doc. 69-15 at 2; Martin Dep. 79:12-17, 80:1-6, 87:17-20, 89:13-20; McCullough Dep. 26:15-27:16, 31:1-4; Clark Dep. 12:3-13, 225:13-18.  The County and the Board of Elections members voted and agreed that Martin could and should ban Coley-Pearson, and delegated to Martin the authority to craft the geographic scope and duration of the ban.  Doc. 69-15 at 2; McCullough Dep. 27:7-21, 28:1-7, 29:8-12, 31:1-19; Clark Dep. 12:3-13, 25:13-18, 34:1-25, 35:1-9, 73:12-16; Chaney Dep. 22:7-23:18, 24:21-25, 25:1-6; Martin Dep. 79:12-17, 80:1-6, 87:17-

20, 89:13-20.  Martin, acting for the County, then instructed Stewart to indefinitely ban Coley-Pearson from any location where the Board of Elections conducted business – whether or not voting was occurring.  Doc. 69-15 at 2; Doc. 84-14 at 9:55-10:05, 18:30-19:00; Martin Dep. 89:13-20.

Several hours later, Coley-Pearson returned to the Board of Elections with another voter who needed transportation to get an ID and then vote.  Coley-Pearson Dep. 52:1-25.  While still in the parking lot, Martin again summoned the police, Coley-Pearson Dep. 53:14-16, and told Coley-Pearson that she was "banned from this parking lot, banned from this premises."  Doc. 69-8 at 0:01:30. Stewart presented Coley-Pearson with a Criminal Trespass Ban issued at the behest of "Emily Misty Hayes who controls said property and who has been authorized by said owner/management," that banned her from the Board of Elections as well as "any polling place that is controlled by the Coffee County Board of Elections during the time of voting or any other Board of Elections business," including any property, anywhere "being lawfully used by the board."  Doc. 69-4; Doc. 69-8 at 0:01:40-0:01:50, 0:15:00; Coley-Pearson Dep. 116:9-118:15.

Reason: **EJECTED**

Additional Comments (If Applicable):
On 10/27/2020 at 1132 hours I, Sergeant Joe Stewart, was summoned to 224 West Ashley Street and asked to ban Olivia Pearson from the premises. This also extends to any polling place that is controlled by the Coffee County Board of Elections during the time of voting or any other Board of Elections business. This will include property not at 224 West Ashley Street but being lawfully used by the board  Pearson is being banned for disruptive behavior. She may only come to a polling place in order to vote and she has already cast her ballot for this years election. She was told that she was banned by elections supervisor Misty Martin.

Doc. 69-4. Stewart instructed Coley-Pearson to leave the parking lot, and when Coley-Pearson questioned the lawfulness of the ban, Doc. 69-4 at 0:15:00-0:16:00, Martin requested that Stewart arrest Coley-Pearson. Doc. 69-4 at 0:16:00-0:16-48. Stewart did so, and Coley-Pearson was booked into the Coffee County Jail. Doc. 69-4 at 0:16:00-0:16:48.

The Criminal Trespass Ban prevented Coley-Pearson, a sitting Douglas Commissioner, from entering *any place* where the Board of Elections might conduct business, including any governmental meetings involving the Board, or even informal Board of Elections members/employees meetings taking place in other public places, like restaurants. Moreover, she could not assist and encourage voters as she typically would for the remainder of the early voting period, election day, and the early voting period for the 2021 Senate runoff because she feared she would be arrested, jailed, and prosecuted if she "set foot on any property—including a parking lot—controlled by the Coffee County Board of Elections." Doc. 84-2 ¶ 13. Indeed, Coley-Pearson refrained from even

9

providing voters with transportation to polling sites because she feared that Martin or someone else would try to have her arrested again. *Id*.

### B.    *Procedural History*

Plaintiff filed this suit on December 11, 2020, against Defendant Martin, Coffee County (by and through its Board of Elections), the City of Douglas, and the City of Douglas police officers involved in her arrest. Doc. 1. Coley-Pearson sought damages and injunctive relief to enjoin enforcement of the Criminal Trespass Ban. On December 17, 2020, the request for a preliminary injunction was withdrawn after Defendants dropped the Criminal Trespass Ban thereby permitting Coley-Pearson to vote in the runoff. Doc. 10 ¶¶ 1-2.

Coley-Pearson settled claims against the City of Douglas and the individual police officers. Doc. 38. On June 9, 2022, the Coffee County Court dead-docketed the criminal charges, which were later dismissed with prejudice. Doc. 53 ¶ 36.

After discovery, Defendants moved for summary judgment. Doc. 69. The district court granted that motion, repeatedly emphasizing that summary judgment was warranted primarily because City of Douglas police officers, and not Defendants Martin or Coffee County, issued the Criminal Trespass Ban. Doc. 106.

## SUMMARY OF ARGUMENT

This case involves the constitutionality of a broad Criminal Trespass Ban issued against Plaintiff Olivia Coley-Pearson, a Douglas City Commissioner, that prevented her from assisting voters in elections and otherwise barred her "indefinite[ly]" from advocating for her constituents in any government building or other place where the Coffee County Board of Elections (Board) conducted "business."  The Ban was issued at the behest of the Elections Supervisor, Defendant Emily Misty Martin, after she was delegated final policymaking authority to issue a Ban through a vote of the Board on the advice of the County Attorney.

After the district court's order granting summary judgment, this Circuit found that a similar (but narrower) ban was unconstitutional:

> By its terms, the order indefinitely barred McDonough from city hall, preventing him from attending all future city council meetings…. This sweeping, indefinite ban on McDonough's attendance is not narrowly tailored—it "burden[s] substantially more" of McDonough's speech "than is necessary to further" the City's interest in avoiding disruption at its meetings.

*McDonough v. Garcia,* No. 22-11421, 2024 WL 106093, *2 (11th Cir. Jan. 10, 2024). Because the Ban here, which applied to a sitting government official, was also indefinite and even broader and more uncertain in its geographic scope, the district court's order upholding the Ban should be reversed.

11

Moreover, as to the issuance of the Ban, the district court failed to view the factual record in the light most favorable to Plaintiff and omitted key facts that present jury questions on constitutionality including viewpoint neutrality and reasonableness. Those facts show that Coley-Pearson had previously been charged and swiftly acquitted by a jury for legally assisting voters in charges also instigated by these same Defendants. This time, while doing the same thing—legally assisting another voter—Coley-Pearson simply asked a question about the purpose of a button on a voting machine. Defendant Martin, with the Board's vote and backing, falsely claimed a disruption and orchestrated a Ban and resulting arrest designed to again deter Coley-Pearson from encouraging and assisting voters. Under bedrock principles of proximate cause, a reasonable jury could find that Coley-Pearson would not have been banned, or arrested for resisting the ban, "'except for that constitutional tort'" committed by Defendants. *See* Eleventh Circuit Pattern Jury Instructions, Civil Cases § 5.3 (Fourth Amendment Claim) (quoting *Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1165 (11th Cir. 2005)).

12

## ARGUMENT

I.  **THE CRIMINAL TRESPASS BAN IS FACIALLY UNCONSTITUTIONAL IN ITS TEMPORAL AND GEOGRAPHIC SCOPE, AND AS APPLIED BECAUSE IT WAS UNREASONABLE AND NOT VIEWPOINT NEUTRAL.**

   A.  **The Criminal Trespass Ban is Facially Unconstitutional.**

   1.  **The Ban's temporal and geographic scope extended far beyond polling places**

A critical error in the district court's analysis was in limiting its examination of the Criminal Trespass Ban to the location where Coley-Pearson happened to be on the day of her arrest: An active polling place and a parking lot area immediately outside. *See* Doc. 106 at 26–36 (analyzing whether the Polling Place and adjacent parking lot was a non-public forum).

In fact, the Ban by its terms extended beyond the times when voting occurred and outlined a broad geographic zone beyond polling places to any location "controlled by the Coffee County Board of Elections during the time of voting or any other Board of Elections business." *Id.* Beyond that, it applied even further to any location, anywhere, "being lawfully used by the board." *Id.* This means the Ban excluded Coley-Pearson from any public space where the Board decided to conduct business, including any meetings involving the Board of Elections—critical meetings for a sitting Douglas Commissioner to attend. By its terms, the Ban also applied to any area where recruiting or training of election

13

workers might occur; and any other location where Board of Elections members, employees and volunteers might be meeting or engaged in purchasing, mailing, or any other tasks associated with elections.  *See* Doc. 69-4.  In other words, if members of the Board went to lunch in Douglas where Coley-Pearson was already dining, Coley-Pearson would have to leave based on the plain terms because the restaurant was now "being lawfully used by the board."[2]

The Ban on its face was also "indefinite." The space to provide for an expiration date stated "Indefinite [YES]" and there was no date identified for "Expiration."  *See id.* (upper left corner).

The Ban was in place at two particularly critical times.  First, from October 27, 2020 until November 3, 2020 (the General Election), Plaintiff could not engage in constitutionally expressive conduct, including driving voters to and from the polls and assisting voters who needed help.[3]  Second, early voting for the

---

[2] *See* Doc. 90, Cheney Dep. 31:20–24 (testifying that Board would have lunch "as a group"); Doc. 75, Martin Dep. 119:8–120:13 (testifying in part about misconduct related to reimbursement for official and unofficial lunches).

[3] Coley-Pearson testified that the ban particularly chilled her voter advocacy and assistance: "I did not try to assist anyone with voting because I was afraid that I would be arrested, jailed, and prosecuted again if I set foot on any property — including a parking lot — controlled by the Coffee County Board of Elections." Doc. 84-2 at 4.  *See also* Coley-Pearson Dep. 199:24–25 ("Had I not went to jail I would have assisted others . . . . Because that's what I do.").

January 2021 Senate run-offs began on December 14, 2020, *see* O.C.G.A. § 21-2-385(d)(1)(C), and remained in place during this early voting period.[4]

There was no appeal process whatsoever to challenge the issuance of the Ban. *See* Doc. 64-1; Martin Dep. 96:17–21 ("I do not know anything about that," referring to whether Plaintiff was advised about the possibility of an appeal). Plaintiff had to file a federal civil rights suit, and only in response to a preliminary injunction hearing did Defendants rescind the Ban. Doc. 10.

Finally, and critically, the Ban applied not just to a citizen, but to an elected Douglas City Commissioner, who frequently advocated for constituents, including in meetings at government buildings where "Board of Elections business" might be conducted. Each time Coley-Pearson entered a public building, she faced potential criminal prosecution for trespass. Indeed, she was arrested in a parking lot after bringing a voter to a polling place.

### 2.    The Ban was unreasonable and not narrowly tailored.

To be constitutional, the Criminal Trespass Ban must have been both reasonable and viewpoint neutral. These principles apply to areas within the polling place and to the parking lot where the arrest occurred.[5] *Compare*

---

[4] The ban also applied when voting was not ongoing, as members of the Board of Elections were employed on a fulltime, year-round basis.

[5] The district court requested supplemental briefing on whether the parking lot was a public forum. While the district court's conclusion on this issue is debatable,

*Minnesota Voters Alliance v. Mansky*, 138 S.Ct. 1876, 1886 (2018) ("A polling place in Minnesota qualifies as a nonpublic forum."), *with Burson v. Freeman*, 504 U.S. 191, 196 (1992) (Tennessee law barring electioneering within 100 feet of a polling place, to include parking lots, "bars speech in quintessential public forums").[6] Even in the non-public forum interior area of the polling place, restrictions on First Amendment activity must be "reasonable in light of the purpose served by the forum." *Mansky*, 138 S. Ct. at 1886. Interior areas are subject to reasonableness, which requires that the government "articulate some sensible

---

it is ultimately irrelevant because the Ban applies to any area where Board of Elections' business is conducted (without any warning as to where those areas are) and specifically applies beyond the location of the arrest. Doc. 64-1.

      In any case, this Circuit has found parking lots to be public forums. In *Naturists Society, Inc. v. Fillyaw*, the Court found that a parking lot was a public forum. 958 F.2d 1515, 1522 (11th Cir. 1992) ("the diagram appended to the court's opinion reveals, the park is more than a beach. In particular, it contains parking lots, a nature center, and walkways. Speech and expressive conduct in these areas may not pose the same evils as on the beach. In declaring the park a non-public forum based solely upon its beach characteristics, the district court ignored other areas of the park which are not beach."); *United States v. Fransden*, 212 F.3d 1231, 1237-38 (11th Cir. 2000) (lower court erred in concluding that park generally, including "parking lots," was not a traditional public forum); *Langton v. State*, 261 Ga. 878 (1992) (invalidating a blanket ban on free speech activity in parking lot of Georgia Department of Labor facility).

[6] *See also CBS Broad., Inc. v. Cobb*, 470 F. Supp. 2d 1365, 1368 (S.D. Fla. 2006) (area outside a polling place is a "quintessential public forum[]"). This Court has recognized that the *Burson* plurality's holding is binding in this respect. *See Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1218 n.9 (11th Cir. 2009).

basis for distinguishing what may come in [the forum] from what must stay out." *Id.* at 1888.[7]

The district court primarily erred because the Ban facially extends to areas well beyond the polling place and its immediate exterior parking lot. These areas appear to include designated and limited public forums as well as traditional public fora where a "presumption" of unconstitutionality requires content neutrality and "the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2231 (2015) (*quoting Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). In these unspecified other buildings/locations where Board of Elections "business" is conducted, strict scrutiny also applies requiring content neutrality, a compelling governmental interest, and narrow tailoring. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983).

This Circuit has long held that citizens "have a constitutionally protected liberty interest to be in parks or on other city lands of their choosing that are open to the public generally." *Catron v. City of St. Petersburg*. 658 F3d. 1260, 1266

---

[7] In other words, a reasonable restriction must have "objective, workable standards," *Mansky*, 138 S.Ct.. at 1891, and safeguards against "haphazard and arbitrary enforcement," *Cambridge Christian Sch. Inc. v. FHSAA*, 942 F.3d 1215, 1243 (11th Cir. 2019).

(11th Cir. 2011).  This interest "in visiting city property that is open to the public .

. . will be deprived by the issuance of a criminal trespass warning."  *Id.* at 1267.

This Circuit's recent decision in *McDonough v. Garcia* addresses a trespass

ban predicated on extremely disruptive conduct at a city council meeting that

included "threats," "curse words," and gestures with "his middle finger."  No.

22-11421, 2024 WL 106093, *2 (11th Cir. Jan. 10, 2024).  A "blanket ban" was

issued preventing McDonough from the "premises – including during city

council meetings." *Id.*  After an extensive discussion of public forum analysis

focused on "attending city council meetings," this Circuit found that "designated

public forum" analysis applied.  *Id.* at 9.  Under this analysis, the Court found

that even assuming a "significant interest in conducting orderly, efficient

meetings of public bodies," the trespass order "was not narrowly tailored" and

there were not "alternative avenues" for speech:

> By its terms, the order indefinitely barred McDonough from city hall,
> preventing him from attending all future city council meetings.
> Wright informed McDonough that his ability to return and speak
> depended on his writing a letter—unmentioned were to whom the
> letter should be sent and what it should say.  This sweeping, indefinite
> ban on McDonough's attendance is not narrowly tailored—it
> "burden[s] substantially more" of McDonough's speech "than is
> necessary to further" the City's interest in avoiding disruption at its
> meetings.  The City was permitted to remove McDonough from the
> July meeting after he behaved disruptively. It was not permitted,
> however, to ban him from all future meetings, offering relief and
> readmission only if he "wrote a letter"—an action described in such
> vague terms as to be functionally meaningless.

Nor were the City's proposed alternative channels for contacting the city council—email, physical mail, and phone calls—enough to preserve McDonough's First Amendment rights. Public city council meetings are just that—public. An attendee's interest in speaking may be as much to rally or inform other members of the public as to address the council members themselves. And it is certainly easier to hold the city council accountable in a public forum rather than a private one. The City's trespass order against McDonough thus fails the scrutiny applicable to content-neutral regulations for a designated public forum. *Id.*

Earlier, in *Crowder v. Housing Authority of the City of Atlanta,* this Circuit reversed a finding that a complete ban in a non-public forum was permissible. 990 F.2d 586, 589-590 (11th Cir. 1993). In *Crowder,* a tenant sued the housing authority for denying him access to two areas where he wanted to conduct a Bible study group: the auditorium (a limited public forum) and the library (a non-public forum). *Id.* Ultimately, the tenant was charged with "violation of a lawful order to leave," but criminal charges were dismissed. *Id.* After a jury verdict in favor of the housing authority, the tenant appealed the denial of a judgment notwithstanding the verdict. Even though this Court agreed that the library was a non-public forum, it found that the "complete ban was not narrowly tailored to meet the stated security concerns," *id.* at 592, though the court noted that a "temporary, therapeutic remedy" might have been permissible. *Id.* at n. 7 and 9. This Court further found that a "majority vote" requirement for access was unconstitutional because "management violated Crowder's First Amendment rights by making them contingent upon majority

approval, especially where tenants were totally unguided by objective standards." *Id.* at 592.

Like *McDonough* and *Crowder, t*he Criminal Trespass Ban, by its terms, is "indefinite" in its duration. Moreover, it is even broader and more uncertain in its geographic scope. *McDonough* applied to one building and only "during council meetings." *Crowder* similarly applied to an auditorium and a library but only for specific purposes. Here, in sharp contrast, any government building or other location was subject to the Ban if it was a "polling place" "**or** [where] any other Board of Elections business" was being conducted **or** to any location "lawfully used by the board." The geographic reach of this restriction was unknown and unknowable to Coley-Pearson, and she faced arrest for violating its uncertain terms. Coley-Pearson also had no alternative means of assisting voters if she was not even permitted to help drive them to the polls, as she had done when she was arrested. Finally, unlike *McDonough*, there was no means articulated (such as the writing of a letter) to potentially escape the permanent and unclear Ban. In short, a sitting public official was left to guess, at risk of arrest, what government buildings she was banished from.

Consistent with *McDonough* and *Crowder*, courts have consistently held that categorical bans, even in nonpublic forums, are unconstitutional. *See*, *e.g.*, *Huminski v. Corsones*, 396 F.3d 53, 92–93 (2d Cir. 2005) (trespass notices

categorically banning individual from local courthouses unreasonable and noting "[s]uch broad restrictions are generally frowned upon even in nonpublic forums"); *Mama Bears of Forsyth Cty. v. McCall*, 2022 WL 1811026, *15 (N.D. Ga. Nov. 16, 2022) ("A permanent ban on Ms. Hair's attendance at Board meetings is unreasonable."); *McBreairty v. Sch. Bd. of RSU 22*, 2022 WL 2835458, at *11 (D. Me. July 20, 2022) ("Singling out one individual and banning his (perhaps disfavored) speech, and essentially preventing him from engaging in a form of civil discourse that is available to everyone else . . . is unreasonable."); *Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536, 549 (D. Vt. 2014) ("[A] categorical ban on expressive speech singling out an individual does not even satisfy the lower threshold of reasonableness review.").

Following *Crowder* and *McDonough,* this Court should reach the same conclusion of "unreasonableness" and all the more clearly here under strict scrutiny because the Ban's terms reached unknowable other buildings or areas where the Board of Elections might conduct "business" even if not at the time or location of voting. *Burson*, 504 U.S. at 196 (area beyond 100 feet from polling place was "quintessential public forum[]").

### 3. The Criminal Trespass Ban Lacked Objective Standards for Enforcement.

Beyond the geographic and temporal scope problems, the Ban here, like *Crowder*, was a product of both a "majority vote" and its ultimate application was

"unguided by objective standards." *Crowder*, 990 F.2d at 592. There was no underlying criminal statute Defendants alleged that Coley-Pearson violated. The Board of Elections voted to allow Martin to determine when, whether, where and how long to ban Coley-Pearson.

The Supreme Court has long held that First Amendment restrictions imposed by government officials "in the absence of narrowly drawn, reasonable and definite standards for officials to follow" are invalid. *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951). Indeed, "[e]ven if a particular restriction or condition is an otherwise permissible content-neutral regulation of the time, place, or manner of speech, it is unconstitutional if a government official has unbridled discretion to apply it." *Bourgeois v. Peters*, 387 F.3d 1303, 1317 (11th Cir. 2004) (citing *Burk v. Augusta-Richmond Cty.*, 365 F.3d 1247, 1256 (11th Cir. 2004)); *see also Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1226 (11th Cir. 2017) (unbridled discretion doctrine applies in both limited and nonpublic forums). While most cases addressing unbridled discretion involve permitting or licensing schemes, *Barrett*, 872 F.3d at 1221, the doctrine is "not so formalistic," *id.* at 1227, and has been held to apply to a wider range of uncabined burdens on expression, including ad hoc decisions of government officials.

In *Bourgeois v. Peters*, this Circuit invalidated a policy requiring that protestors submit to a metal detector prior to entering the site designated for a

22

particular protest because, as relevant here, "[t]he decision to implement this search policy was an exercise of the apparently unbridled discretion of [the] Police Chief[.]" *Id.* at 1318. The Court explained:

> The City does not provide us with any generally applicable state laws or local ordinances that set forth the circumstances under which individuals attending a large public gathering will be searched. The decision to implement searches instead appears to be left to the Chief's personal discretion, to be based on whatever factors he deems appropriate at any given point in time. The First Amendment does not permit the government to place burdens on speech and assembly in such an unprincipled, *ad hoc* manner. *Id.*

In this case, a jury could determine the decision to ban Coley-Pearson from broad swaths of Coffee County was an exercise of the unbridled discretion. As in *Bourgeois*, no laws or ordinances delineated the circumstances under which an individual may be banned from a polling place (or, for that matter, from any County property used by the Board of Elections). *See id.* And Martin confirmed during her deposition that "[n]obody told [her] anything" about how to determine whether someone was being disruptive. Martin Dep. 91:2–14. Thus, a jury could easily find that the decision to ban individuals was left to the biases and whims of Martin and the Board of Elections, "based on whatever factors [they] deem[] appropriate at any given point in time." *Bourgeois*, 387 F.3d at 1318. That is unconstitutional. *See id.* ("The First Amendment does not permit the government to place burdens on speech and assembly in such an unprincipled, *ad hoc* manner.").

Whether or not Defendants reasonably believed Coley-Pearson caused a disruption in the voting area or instead targeted her expressive conduct—which is hotly disputed—is irrelevant to the unbridled discretion analysis. *See id.* (dismissing Police Chief's explanation for deciding to search protestors as "entirely miss[ing] the point"). That is because, where an official has acted with unrestrained discretion, "the problem is not potential abuses but the very existence of broad, censorial power."[8] *Sentinel Comms. Co. v. Watts*, 936 F.3d 1189, 1197-98 (11th Cir. 1991) (quotation and citation omitted). Indeed, "because the very existence of the discretion lodged in the public official is constitutionally unacceptable," courts may invalidate an excessively broad grant of discretion "on its face, without regard to the particular facts of the plaintiff's case." *Id.* at 1197 (quotation and citation omitted).

### 4. The Criminal Trespass Ban is an Unlawful Prior Restraint.

The Criminal Trespass Ban is also a prior restraint because it barred future speech in a host of locations, and not, as the district court held, a "subsequent punishment." Doc. 106 at 51.[9] A prior restraint "exists where the government

---

[8] *See also Bourgeois*, 387 F.3d at 1318 ("The problem is not that the Chief applied an inappropriate standard in deciding whether to implement this search policy. Instead, the problem is that there were no objective, established standards for the Chief to utilize in making this decision other than those he happened to deem relevant.").

[9] *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (identifying unbridled discretion as one of the "evils that will not be tolerated" in a system of prior

can deny access to a forum before the expression occurs." *Bourgeois*, 387 F.3d at 1319.  Prior restraint is censorship of the worst kind—it prevents expression from reaching the marketplace of ideas.  *See Southeastern Promotions v. Conrad*, 420 U.S. 557, 559 (1975) "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  The ban here was a prior restraint because it prevented Coley-Pearson from assisting prospective voters in exercising their rights or engaging in speech in any areas where the Board of Elections conducted "business," even if voting was not occurring.  The Ban accordingly comes with "a heavy presumption against its constitutional validity." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

In *McDonough*, although the Court found that the prior restraint argument was not properly raised, it noted that "prior restraint analysis already maps onto the tough standards that apply in traditional and designated public forums." *Id.* at *9 n.9.  Here, the prior restraint issue was fully argued, but the district court found that the Ban "was not a prior restraint because it did not require an application for or prior approval of Plaintiff's speech" and was "issued after Plaintiff's disruption occurred." Doc. 106 at 51.  Not so.  The Ban was a prior

---

restraint); *Barrett*, 872 F.3d at 1222–23 (declining to decide whether unbridled discretion doctrine applies beyond prior restraint context because policy at issue was a prior restraint).

restraint precisely because it prevented future speech based upon a prior alleged disruption. *Universal Amusement Co. v. Vance*, 587 F.2d 159 (5th Cir. 1978), *aff'd* 445 U.S. 308 (1980) (holding unconstitutional a Texas statute which authorized state judges to enjoin the future exhibition of films by a business that had shown obscene films in the past); *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 507 (6th Cir. 2001) ("[W]here a law sets out primarily to arrest the future speech of a defendant as a result of his past conduct, it operates like a censor, and as such violates First Amendment protections against prior restraint of speech").

### B. Jurors Could Find The Criminal Trespass Ban Was Neither Reasonable Nor Viewpoint Neutral.

The district court also concluded that the Criminal Trespass Ban was viewpoint neutral and reasonable because, in the court's view, Coley-Pearson failed to present any evidence of Defendants' desire to suppress her views on voter turnout, Doc. 106 at 36-43, and because the Criminal Trespass Ban was "not unreasonable on the backdrop of [Coley-Pearson's] admitted disruption at the Polling Place." *Id*. at 26. In making these factual determinations, however, the district court breached the well-established summary judgment standard by ignoring large swaths of the record that establish a genuine issue of fact, while also weighing evidence and making inferences in Defendants' favor. This Court should accordingly reverse and remand.

26

It is well-settled that the district court's function at summary judgment "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In making this determination, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The facts, viewed in Coley-Pearson's favor, would allow a jury to find that Coley-Pearson was targeted with a Criminal Trespass Ban to stop her lawful assistance of voters and that she was not disruptive in simply asking about the purpose of a button on the voting machine.

## 1. The Ban was not viewpoint neutral.

Viewpoint discrimination occurs when the government regulates speech based on the "opinion or perspective of the speaker." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 167 (2015) (quotation marks omitted). Viewpoint discrimination is an "egregious form of content discrimination" and is "presumed impermissible." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). And because "the government rarely flatly admits it is engaging in viewpoint discrimination," *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004), "[t]he existence of reasonable grounds for limiting access to

a nonpublic forum . . . will not save a [restriction] that is in reality a façade for viewpoint-based discrimination." *Cornelius v. NAACP*, 473 U.S. 788, 811 (1985).

Here, Coley-Pearson presented a genuine factual dispute as to whether Defendants' decision to obtain the Ban was motivated by viewpoint discrimination, namely a desire to suppress Coley-Pearson's view (and accompanying expressive conduct) that historically disenfranchised groups should be encouraged to vote and receive assistance when necessary. *See* Doc. ¶¶ 4-10. For instance, it is undisputed that Martin played a prominent role in Coffee County's previous unsuccessful attempt to prosecute and punish Coley-Pearson for her work to lawfully assist voters during the 2012 election. Doc. 53 ¶ 13. Martin not only served as the lead prosecution witness against Coley-Pearson, Doc. 84-5 at 8-36; she also took on the role of "prosecutor in the case" by signing her name to the indictment as "prosecutor" Doc. 84-6, and sat at counsel table with the district attorney throughout the trial. Martin Dep. 16:20-25, 17:1-12, 44:14-25, 45:1-7; Coley-Pearson Dep. 27:23-25, 28:1-9.

In addition to initiating and participating in the failed 2018 prosecution of Coley-Pearson, the record also shows that Martin made multiple other unsuccessful attempts to have Coley-Pearson investigated and prosecuted for engaging in lawful activities aimed at increasing minority voter registration and turnout in Coffee County:

28

- Martin sent the district attorney (the same one who had unsuccessfully prosecuted Coley-Pearson in 2018) a text message with a video of Coley-Pearson participating in a voter registration drive and suggested to the prosecutor that Coley-Pearson had violated the law by offering to help a woman with changing her husband's address. Doc. 53 ¶¶ 28-29; Doc. 84-8; Martin Dep. 104:25-108:6.

- Martin contacted the Secretary of State's Office to offer evidence of Coley-Pearson allegedly "campaigning within the 150-foot mark" of a polling place. Doc. 53 ¶ 29.

Taken in the light most favorable to Plaintiff, evidence of Martin's repeated attempts to have Coley-Pearson investigated, prosecuted, and punished for engaging in activities aimed at increasing voter turnout is sufficient for a jury to find that Martin bore hostility towards Coley-Pearson's views on voter participation and that Martin secured the Ban as part of an ongoing effort to suppress Coley-Martin's viewpoint and expressive conduct. The district court, however, failed to address or credit any of this evidence that a jury could view demonstrated a lack of viewpoint neutrality. *See generally* Doc. 106 at 38-44. *But see Tolan*, 572 U.S. at 658 (reversing summary judgment where district court "did not credit directly contradictory evidence").

But there is more. In addition to this evidence of Martin's longstanding animus towards Coley-Pearson's activism, there is ample evidence that could lead a jury to find that Martin was motivated by viewpoint discrimination at the precise moment she obtained the Ban.

29

Larry Nesmith, an elections observer who was present at the Board of Elections on the morning of the incident, testified that Martin confronted Coley-Pearson only after she learned from another observer, Cathy Latham, that Coley-Pearson was at the precinct "assisting voters" which she thought was "stuff that she wasn't supposed to be doing." Nesmith Dep. 25:9-13. Significantly, Latham was hardly a neutral party, having recorded and posted a video condemning Coley-Pearson's activism as a serious problem in need of correction. Doc. 84-7. According to Nesmith, upon hearing that Coley-Pearson was assisting voters, Martin "went from zero to a hundred just that fast," *id.* at 24:25-25:1, and both Martin and Latham "left stormful"[10] to confront Coley-Pearson, *id.* at 27:17-18. When Martin returned a few minutes later, she was "very upset" and "[v]ery agitated," *id.* at 28:2-4; 29:17-18, and said that she was "tired of Olivia's shit" and would "put a stop to this." *Id.* at 28:6-8. Martin then made it clear to law enforcement that she "doesn't want [Coley-Pearson] assisting anybody else[,

_____

[10] Both Martin and Latham are defendants in a current prosecution in Georgia alleging that they engaged in conspiracy to commit election fraud, interfering with elections, unlawfully possessing ballots, computer theft and trespass, and perjury, in connection with providing voter data to a political candidate. These actions took place at the Coffee County Board of Elections during the 2020 election. *See State v. Trump*, 23SC188947 (Fulton Super. Ct. Aug. 14, 2023) (Indictment) at 64-67 Acts 142-155, available at https://int.nyt.com/data/documenttools/georgia-indictment-trump/daed97d37562a76f/full.pdf. Martin is identified as Hampton in the indictment.

and] she says she's gonna do whatever she has to do to keep her out of this building." Doc. 69-8 at 18:30-19:00. Indeed, Martin offered to lie to law enforcement to prevent Coley-Pearson from returning to assist more voters: "She is not to come back in my office. . . . if I have to say I feel threatened." *Id.* at 9:55-10:05.[11]

The district court improperly weighed this evidence against Coley-Pearson. For instance, the court rejected Nesmith's testimony as evidence of viewpoint discrimination because, as the court saw it, Nesmith's testimony showed that Martin flew into a rage only after hearing that Coley-Pearson was "doing something wrong," and not because of Latham's report that Coley-Pearson was simply assisting voters, which Latham thought was wrong (and Martin also thought was wrong based on her failed prior prosecution). Doc. 106 at 39. But this conclusion required the district court to make at least two inferences in Defendants' favor: One, that Latham was referring to some form of misconduct independent of assisting voters when she informed Martin that Coley-Pearson was "doing something wrong at the polling site." And two, that

---

[11] The audio from Sergeant Stewart's bodycam also reveals that Martin alleged that the woman Coley-Pearson assisted was able to read, and Martin encouraged law enforcement to investigate the voters Coley-Pearson assisted. Doc. 69-8 at 7:30-7:40, 43:15-43:30. Martin later conceded that she had no business determining whether voter's needed assistance, which she learned after the failed prosecution. Martin Dep. 71:10-18.

Martin was not upset by the report that Coley-Pearson was assisting voters, but was instead only triggered when she heard that Coley-Pearson was "doing something wrong."

However, a reasonable jury could conclude just the opposite. When Latham's words and actions are viewed together with her video condemning Coley-Pearson, a reasonable jury could find that Latham was referring to the simple act of Coley-Pearson assisting a voter when she said Coley-Pearson "was doing something wrong." Similarly, a jury could conclude that, given Martin's repeated efforts to have Coley-Pearson investigated and prosecuted for her voter advocacy, Martin flew into a rage upon hearing that Coley-Pearson was assisting a voter because she viewed that conduct as "doing something wrong." Because the evidence here lends itself to reasonable finding of viewpoint discrimination, summary judgment was not appropriate.

## 2. The Criminal Trespass Ban was not reasonable.

The district court also weighed the evidence and drew inferences in Defendants' favor to conclude that the issuance of the Ban was reasonable. However, based on the full record before the district court, a reasonable jury

could decide that the Ban was a wholly unreasonable response to the events that transpired in the polling site.[12]

The record contains competing factual narratives of what led Martin to call the police and request that Coley-Pearson be banned.  Coley-Pearson testified that she was conducting herself appropriately inside the polling location and that Martin caused a disruption by screaming at Coley-Pearson in response to Coley-Pearson's question to a poll worker about the purpose of the buttons on the ballot scanner.  Coley-Pearson Dep. 45:14-46:1; *see also* Hill Dep. 22:20-23.  When Coley-Pearson asked Martin directly about the buttons, Martin "kept hollering at the top of her lungs," Coley-Pearson Dep. 46:4-13, and then "hollered out" twice to "call 911," when Coley-Pearson questioned why Martin, as the elections supervisor, did not know the purpose of the buttons.  *Id*. at 46:14-16.  Coley-Pearson then voluntarily headed to the exit to leave, while Martin "walk[ed] behind [her] hollering and screaming steadily at [her]."  *Id*. at 46:18-20.  Just before she exited, Martin referenced one of her prior attempts to have Coley-Pearson convicted for assisting voters, and yelled at Coley-Pearson, "that's what got you in trouble before, touching buttons."  *Id*. at 46:22-25.  Then, for the first and only time, Coley-Pearson raised her voice to tell Martin the truth—that

---

[12] As discussed in Section I(A), *supra*, the Ban is subject to strict scrutiny because it extended well beyond the polling location.  It is also facially unreasonable regardless of the forum.

Martin was lying, but even then, Coley-Pearson did not raise her voice "to the point of how [Martin] had raised hers." *Id.* at 47:7-15.

Although Defendants maintain that Coley-Pearson was rightfully banned for causing a disruption, Doc. 69-2 at 18-19, the facts and inferences permit a reasonable jury to conclude that the Ban was an unreasonable response because it was Martin (not Coley-Pearson) who caused the disruption and behaved inappropriately inside the polling site. Moreover, there is absolutely no evidence in the record that Coley-Pearson refused to leave the polling site after Martin began yelling at her, or that Defendants had reason to believe that Coley-Pearson intended to return to create a disruption. A jury could accordingly conclude Defendants lacked any reasonable basis to issue an indefinite and broad Ban that prohibited Coley-Pearson from setting foot on any location where the Board of Elections conducts business.

The district court, however, adopted wholesale the Defendants' slanted view of the evidence to hold that the Ban was a reasonable response to maintain order inside polling places. Doc. 106 at 47. The district court relied on Coley-Pearson's admission that she raised her voice just once as she was exiting the polling site, and on some witness' accounts that Coley-Pearson was disruptive. *Id.* But in doing so, the court ignored or discounted the evidence that Martin was the one who created the disruption and behaved egregiously inside the polling

location.  A jury, and not the district court, should accordingly be the one to

determine the reasonableness of the Ban in light of all the evidence.

## II.    A    JURY    MUST    RESOLVE    DAMAGES    CLAIMS    AGAINST DEFENDANTS.

### A.    A reasonable jury could find Coffee County caused the Criminal Trespass Ban, which was the sole basis for the arrest.

On municipal liability, the district court granted summary judgment to

Coffee County because it held the Criminal Trespass Ban "was neither drafted

nor issued by either of the remaining defendants."  Doc. 106 at 1.  It does not

follow that Defendants are absolved of responsibility because they successfully

convinced others to do their bidding.  The district court's contrary conclusion

improperly resolved disputed questions of proximate cause as a matter of law.

The district court found no "written policy" or custom.  Doc. 106 at 24.

Pearson agrees.  However, the district court erred because it *failed to address the*

*Monell* arguments actually pursued by Coley-Pearson—*final policymaker*

*analysis*.[13]   *Compare Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1989) ("The instant

case, however, concerns altogether different methods of proving custom or

---

[13] As Pearson pointed out in briefing on summary judgment below, Doc. 84 at 33-40, "Defendants motion for summary judgment addresses municipal liability theories not argued by Pearson, but completely omits the delegated final policymaker theory."  *Id.* at 32 n.39.  The district court made the same error. Doc. 106 at 24.

policy: the delegation of final policymaking authority from one official to another . . . by a final policymaker.").

Here, the Board of Elections **voted** and delegated its final policymaking authority regarding banning persons to the Elections Supervisor who then could determine the standards for when and whether to ban, how long a ban would last, and the geographic breadth of the ban. The Board, and its delegated policymaker, Martin, were a moving force in the unconstitutional Ban they requested as well as the later foreseeable enforcement of the Ban through arrest.

"[I]t is when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts an injury that the government as an entity is responsible under '1983.'" *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978). Contrary to the district court's analysis, Doc 106 at 23-25, under the final policymaker theory, no written policy or unwritten custom is required: "a single decision by proper municipal policymakers," can satisfy the policy/practice requirement of *Monell* "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); *see also McMillian v. Johnson*, 88 F.3d 1573, 1578 (11th Cir. 1996) ("final policymaking authority may be shared").

      1.     **The Coffee County Elections Supervisor was the delegated final policymaker for trespass bans *and* the Criminal**

**Trespass Ban was Officially Promulgated Coffee County Policy.**

In *Pembaur*, the Supreme Court found that *Monell* liability existed in a Fourth Amendment case for a single verbal and incorrect instruction on a phone call where a County Prosecutor instructed officers to "go in and get the witness" without a warrant. *Id.* at 473. This single instruction established municipal liability: "where action is *directed by those who establish governmental policy,* the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* at 481 (emphasis added). Municipal liability may arise from "a course of action tailored to a particular situation and not intended to control decisions in later situations," provided that "the decisionmaker possesses *final authority* to establish municipal policy with respect to the action ordered." *Id.* (emphasis added).

As in *Pembaur*, the County Attorney here approved, and a quorum of the Board conducted a telephonic vote to ban Coley-Pearson. This delegation was consistent with state law.[14] The Coffee County Code of Ordinances provides that the Board of Elections is:

---

[14] *See Martinez v. City of Opa-Locka*, 971 F.2d 708, 713 (11th Cir. 1992) ("The determination of whether or not a particular official has final policymaking authority is governed by state law, including valid local ordinances and regulation"); *McMillian*, 88 F.3d at 1577 ("A municipality may be held liable for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision.").

> [A]uthorized to organize itself, determine its procedural rules and
> regulations, adopt bylaws, specify functions and duties of its
> employees, and otherwise take such action as is appropriate to the
> management of the affairs committed to its jurisdiction." Art. VII, Sec,
> 9. Chaney Dep. Ex. 1 (Code of Ordinances).

Among the powers possessed by the Board of Elections is policymaking regarding allegedly disruptive persons at polling places, including circumstances where banning might be appropriate.

Here, Defendant Martin, after a verbal dispute regarding Coley-Pearson's inquiry about the purpose of a button on the ballot machine scanner, declared to Douglas City Police Officer Stewart, "I don't care what I've got to file, what I've got to do, she is not to come back to my office . . . ." Doc 106 at 4.[15] The officer consulted with the Chief of Police and said that "the county attorney and a majority of the members of the Board of Elections [must] ensure Defendant Martin had the authority to request a trespass warning." *Id.*

Next, with the blessing of the County Attorney, Coffee County Board of Elections members were contacted, voted, and a majority of the Board expressly delegated to its Election Supervisor the authority to ban Plaintiff.

---

[15] *See generally Jordan v. Mosley*, 487 F.3d 1350, 1354 (11th Cir. 2007) ("a non-arresting officer who *instigates or causes* an unlawful arrest can still be liable under the Fourth Amendment").

38

The County Attorney's process was consistent with the normal process for Board of Elections' actions. McCullough Dep. 25:1-7; 24:14-26. Board members testified that they followed this process, and a quorum of the Board polled agreed that the Election Supervisor would have the authority to ban someone. McCullough Dep. 26:15-25; 27:12-16; 31:1-4; Clark Dep. 12:3-13; 25:13-18, *See Mandel,* 888 F.2d at 793 (to identify the final policymaker, "the court should examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices"). The Ban stated that the Elections Supervisor "controls said property or who has been authorized by said owner/management."

The Criminal Trespass Ban also explicitly said that Coley-Pearson "was banned by election supervisor Misty Hayes," rather than by the police department. Thus, after the express delegation, Martin did what the Board told her to, including deciding (1) when and whether to issue a ban, (2) its geographic scope, and (3) its duration, and conveyed her decision to the officer issuing the Ban. McCullough Dep. 27:17-21; 29:8-12; 31:1-19 ("Martin was [authorized to] determine[e] the circumstances under which somebody could be banned"). Moreover, and critically, there was *no appeal process* set out by the Board in the code or in their approval.

Likewise, Clark testified that the Board did not "plac[e] any qualifications

or limits" on the "authority to ban" including no right to "appeal." Martin could

determine the "factors that would be used to determine whether . . . to ban or

bar," or "limits on . . . the geography with which Pearson could be banned."

Clark Dep. 34:1-25; 35:1-9. As in *Pembaur*, this was the first time a banning

situation had occurred. The Board of Elections delegated full policymaking

authority (with no appeal) to its Election Supervisor. Indeed, Martin's ultimate

policy decision addressed these issues in a way even more specific and direct

than the instruction on *Pembaur* to "go in and get the witness."

The municipal liability issues here are very similar to the recent decision in

*McDonough v. Garcia,* No. 22-11421, 2024 WL 106093, *2 (11th Cir. Jan. 10, 2024).

There, the city issued a "a blanket ban from the premises including city council

meetings" *Id.* at *2. When McDonough "asked how he could get the ban lifted,"

the issuing officer told him that he could "write a letter." *Id*. After finding the

ban unconstitutional, *id.* at 22-23, this Circuit turned to the liability for the city.

In short order, the panel affirmed the district court:

> [E]ither the Chief of Homestead Police Alexander Rolle made the
> decision to bar McDonough under the final policymaking authority
> vested in the police department by the city ordinance, or Chief Rolle
> had delegated this authority to Sergeant Wright, who made the final
> call. Either way the City is liable under Section 1983 because a single
> decision by a final policymaker is sufficient for municipal liability. *Id.*
> at *10 n. 10 (*citing Mandel v. Doe*, 888 F.2d 783, 793 (1989)).

As explained in Section I, the ban here was facially unlawful, like that in

*McDonough*, and "[r]esolving . . . issues of fault and causation is straightforward" because (as there) the delegated final policymaker ordered the Criminal Trespass Ban. *See Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404-05 (1997).

> 2.    **The Policy Decision to Issue the Ban was Not Subject to Review by the County Board of Elections or the County Commission.**

This Circuit has emphasized an important limit on delegated final policymakers: when policymaking authority is delegated to a subordinate (here the Elections Supervisor), the Board of Elections must not retain power to exercise meaningful and timely review for the individual delegated powers to be the final policymaker:

> [T]he mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. *Rather, the delegation must be such that the subordinate's discretionary decisions* are not constrained by official policies and *are not subject to review.*

*Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989) (emphasis added) (citations omitted); *see also City of St. Louis v. Prapotnik*, 485 U.S. 112, 129-130 (1988).[16]  This

---

[16] Absent an explicit review process, delegated policymakers may create and execute municipal policy. *Mandel*, 888 F.2d at 792-94 (municipal officer has final policymaking authority when his decisions "are not subject to review" and further holding that discretionary review initiated by the municipal official himself does not prevent the official from being a final policymaker). *See also Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997) ("This Court's post-*Praprotnik* decisions have consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful

Circuit has also emphasized that that review must be explicit, and a citizen must have a meaningful opportunity to exercise a timely and effective appeal.

In *Holloman ex rel. Holloman v. Harland*, this Circuit reviewed the punishment of a student by a Principal when the student raised a fist during the flag salute. Even though there was an explicit appeal process of the asserted final policymaker's decisions, this Circuit found that the requirement of "meaningful review" was not satisfied because there was no opportunity to exercise the process to timely correct a free speech violation or the resulting punishment:

> In the instant case, there was no opportunity for meaningful review by the School Board. While the student handbook set out an formal multi-step appellate process that was theoretically available on paper, Holloman could not, as a practical matter, take advantage of it. Graduation was barely a few days away, and Harland did not offer to "stay" Holloman's punishment while he sought Board review…. Even if the School Board were to engage in an *ex post* review of the punishment, the fact remains that the paddling could not be undone.

370 F.3d 1252, 1278 (11th Cir. 2004) (citations omitted) (collecting authority on "meaningful" review of a delegated policymaker's decisions). *See also Willingham v. City of Valparaiso, Florida*, 638 Fed. Appx. 903, 907-908 (11th Cir. 2016) ("a finding that review procedures are 'theoretically available on paper' does not end the inquiry when [the plaintiff] . . . as a practical matter, [cannot] take

---

administrative review."); *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996) (same); *Martinez v. City of Opa-Loka*, 971 F.2d 708 (11th Cir. 1992) (same).

advantage of it.'").

Finally, turning back to the recent *McDonough* decision, the officer delivering the trespass ban "informed McDonough that his ability to return and speak depended on his writing a letter – unmentioned were to whom the letter would be sent and what it should say." *McDonough*, 2024 WL 106093 at *9. This arguable appellate review process neither called into question the unconstitutionality of the "sweeping, indefinite ban," nor raised an arguable issue that "either" of the possible final policymakers decision-making lacked finality under *Monell*. *Id*; *see also Id.* at *10 n.10. And, of course, here there was not even a hint of a possible appeals process. The only way to overturn the Ban was to file the instant § 1983 action.

Likewise, this case is far more straightforward than the final policymaker issues in *Willingham v. City of Valparaiso, Florida*, 638 Fed. Appx. 903, 907-908 (11th Cir. 2016). There, the Mayor terminated the plaintiff even though "the City Charter gave the City Commission the legal power to hear Willingham's termination appeal . . . and to overrule that termination decision." *Id.* at 907. Despite those review procedures, "theoretically available on paper," this Circuit found that "Mayor Arnold, who made the termination decision, effectively prevented meaningful review" and "sabotaged the entire process" of review over his own decision to terminate Willingham. *Id.* Moreover, the "city

43

attorney's off-the-cuff advice" that conflicted with the formal review process did not alter that "the City of Valparaiso is responsible for a million dollar judgment because Mayor Arnold singularly controlled, made, and implemented all decisions by the City as to Plaintiff Willingham, and then prevented meaningful administrative review. Thus, Mayor Arnold exercised final policymaking authority…. " *Id.* at 908. Here, unlike *Willingham,* the process taken was (1) consistent with the County code, (2) followed the advice of the County Attorney, and (3) culminated in a vote of a quorum of the Board of Elections.

This case is also even stronger than *Holloman*, *Willingham*, and *McDonough* in that the Board of Elections' delegation to the Election Supervisor of the authority to ban persons was (1) by a formal vote in consultation with the County Attorney and (2) did not provide for any system whatsoever of appellate or other review to the Board or the Coffee County Commission, let alone one that provided meaningful and timely remedial review. *Williams v. Fulton Cty. Sch. Dist.*, 181 F.Supp. 3d 1089, 1127 (N.D. Ga. 2016) (citing *Holloman* and noting as to final policymaker that "the specific circumstances of that case demonstrated that his decision to paddle a student was functionally unreviewable.").

Coley-Pearson agrees (and never argued) that there was no custom here, and she agrees (and never argued) that the Ban was drafted by the police. However, the Ban (and its scope) was what Martin requested when telling the

officer "she is not to come back" and when Martin later called the police to arrest Coley-Pearson when she returned because she was "banned." Doc. 106 at 50. A jury can find that the Election Supervisor, as designated final policymaker, banned Coley-Pearson by having a Douglas City Police officer draft the ban she requested. A reasonable jury could also find that the vote to ban Coley-Pearson, with the advice and consent of the County Attorney, was an officially promulgated policy of the Coffee County Board of Elections.

### 3. The Trespass Ban Was the "Moving Force" in the Resulting Arrest.

In addition to showing an action attributable to the County, Coley-Pearson must also present evidence sufficient to show that the County was a "moving force" in the unconstitutional Criminal Trespass Ban and resulting arrest. "Section 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Malley v. Briggs,* 475 U.S. 335, 345 (1986) (*quoting Monroe v. Pape,* 365 U.S. 167, 187 (1961)) (state court judge's intervening decision to approve the arrest warrants did not break causal chain); *Blue v. Lopez*, 901 F.3d 1352, 1359 (11th Cir. 2018) (denial of a directed verdict did not break causal chain). Under the *Monell* "moving force" causation analysis, liability exists when a municipality is the proximate cause of the harm suffered by the Plaintiff, and under that analysis foreseeable intervening causes often do not break the causal chain. *Monell,* 436 U.S. at 690–

45

91; *Cash v. County of Erie*, 654 F.3d 324 (2nd Cir. 2011); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).[17]

In the "moving force" analysis, foreseeable intervening causes do not break the chain of causation. *Conn v. City of Reno*, 591 F.3d 1081, 1101 (9th 2010) ("foreseeable intervening causes will not supersede [the municipal] defendant's responsibility."); *Amnesty American v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004). Moreover, a municipal defendant may be held liable for "those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." *Warner v. Orange County Dept. of Probation,* 115 F.3d 1068, 1071 (2nd Cir. 1997) (quoting *Gutierrez-Rodriguez v. Cartagena,* 882 F.2d 553, 561 (1st Cir. 1989) (a municipality would be responsible for "those consequences attributable to reasonably foreseeable intervening forces, including the acts of

---

[17] Causation in a municipal liability case is generally a factual question for the jury, and where, as here, there is a specific policymaker decision seeking and "directing" the action ultimately taken, the analysis is more "straightforward":

> To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation. Where the action taken or **directed by the municipality or its authorized decisionmaker** itself violates federal law, resolving issues of fault and causation is "straightforward" because proof of such a violation "establishes that ... the municipal action was the moving force behind the injury of which the plaintiff complains." *Harper v. City of Los Angeles*, 533 F. 3d 1010, 1026 (9th Cir. 2008) (internal citations omitted) (emphasis added).

third parties. . . . A negligent defendant will not be relieved of liability by an intervening cause that was reasonably foreseeable, even if the intervening force may have 'directly' caused the harm")) (internal citations omitted).

The district court concluded that Coffee County was not responsible, but failed to read the record in the light most favorable to the non-movant Coley-Pearson.  While Coley-Pearson agrees that Stewart was the signatory, the record viewed in the light most favorable to Coley-Pearson shows that a jury could conclude that the Ban was a result of (1) the demand of the County and its Elections Supervisor, and (2) a process that required a vote of the Board of Elections in consultation with the County Attorney.  As for causation and the "moving force" analysis for municipal liability, a jury could easily find that these actions of Coffee County made it foreseeable that a constitutional violation by another would occur.[18]  Here, the Ban was issued by a Douglas City police officer only because of specific demand by Martin, who had been empowered to issue the Ban by a vote of a quorum of the Coffee County Board of Elections.

---

[18] There must be a constitutional violation—here the unconstitutional ban—but availability of a qualified immunity defense does not negate municipal liability. *See Barnett v. MacArthur*, 956 F.3d 1291, 1301 (11th Cir. 2020) ("We have held that *Monell* ... and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government.' For example, municipal liability can exist if a jury finds that a constitutional injury is due to a municipal policy, custom, or practice, but also finds that no officer is individually liable for the violation."); *Cooper v. Dillon*, 403 F.3d 1208, 1220 (11th Cir. 2005) (same).

Moreover, the subsequent arrest was precisely because Martin again demanded that the Ban she created be enforced.[19]  Causation is direct and foreseeable.[20]

After the County Attorney identified a polling process, a quorum of the Board of Elections voted to ban Coley-Pearson or delegated this decision to Martin.  The police merely effectuated what the County requested.  Then, foreseeably, that Ban was enforced when Martin called the police back to arrest Coley-Pearson for violating the ban by driving someone to vote.  Coffee County was a "moving force" in the issuance and enforcement of the unconstitutional Ban.

### B.    A Reasonable Jury Could Find that Martin Caused Coley-Pearson's Unlawful Arrest

#### 1.    The district court improperly decided proximate cause as a matter of law as to Martin

The district court repeated its errors in absolving Martin of responsibility for Coley-Pearson's arrest at summary judgment by resolving two disputed questions of proximate cause.  First, Martin argued, and the district court agreed, that Martin was not liable for the Ban's unreasonable scope because she did not

---

[19] Indeed, *McDonough* reversed the district court's finding on municipal liability as well as the lower court's finding that the "trespass order did not cause a violation of Plaintiff's First Amendment rights."  *McDonough,* 2024 WL 106093 at *10 n.10.

[20] *See Smith v. District of Columbia*, 413 F.3d. 86, 103 (district liable for policy that "led foreseeably to unsafe providers, which in turn led foreseeably to youths becoming victims of crime"); s*ee also Willingham,* 638 Fed. Appx. at 908 (where mayor and city attorney erroneously told members that the commission lacked authority to review the termination, *Monell* liability was still appropriate).

personally draft the Ban, even though there was no daylight between what Martin asked for and what the officer delivered. Second, and relatedly, Martin argued that she cannot be responsible for the arrest because she did not put on the handcuffs. The district court adopted that reasoning, holding that "Plaintiff's false arrest claim against these Defendants fails because City of Douglas Officers Stewart and Sprinkle—not Defendant Martin—arrested Plaintiff." Doc. 106 at 78. The district court reached that conclusion despite Martin being responsible for directing the unlawful order that was the sole basis for the arrest, explicitly requesting the arrest, and providing false facts that underpinned the arrest.

Whether the actions of law enforcement severed the causal chain between Martin's generation of the Ban cannot be resolved at summary judgment. For one, "it is axiomatic" that "questions regarding proximate cause are undeniably a jury question" and may be determined as a matter of law only "in plain and undisputed cases." *Sanders v. Lull Intern., Inc.*, 411 F.3d 1266, 1271 (11th Cir. 2005) (quotation marks omitted) (quoting *Ontario Sewing Mach. v. Smith*, 572 S.E.2d 533, 536 (Ga. 2002)).

This is not a "plain and undisputed case[]." *Id.* Quite to the contrary, Martin's contention that she cannot be liable for the Ban's unreasonable breadth hinges in large part on a factual dispute: Whether Martin requested that officers ban Coley-Pearson for a limited time, or in perpetuity. Martin's written

statement (authored *after* the Criminal Trespass Ban was issued) says she asked that Coley-Pearson "be banned from the location and any polling place for 2020," Doc. 69-15 at 2, but the bodycam recording of what she *actually* said to law enforcement before the ban was issued contains no mention of any such limitation. Martin actually told officers: "She is not to come back" with no temporal qualification whatsoever. She also said she wanted Pearson banned "during *any* election," Doc. 69-8 at 9:55–10:05, 30:52–53, not that she wanted her banned from this specific election. This dispute precludes resolution of proximate cause at summary judgment.[21] *See Sanders*, 411 F.3d at 1271.

On this record, a jury could conclude the Ban's unreasonable scope and Plaintiff's subsequent arrest was the natural and foreseeable consequence of Martin's actions as the Election Supervisor "who controls said property." Doc. 69-4. "[Section] 1983 defendants are, as in common law tort suits, responsible for the natural and foreseeable consequences of their actions." *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000). The district court's proximate cause analysis is hard to reconcile with the *Jackson* decision. There, this Court found a question of fact about whether an unlawful *Terry* stop ultimately led a third party to start an exchange of gunfire that resulted in law enforcement killing one of the

---

[21] Because Martin's conversation with officers was recorded and that recording differs from what Martin's subsequent testimony, this factual dispute is arguably governed by *Scott v. Harris*. *See* 550 U.S. 372, 380 (2007).

unlawfully seized suspects and injuring another.  The Court's rejection of the

causation arguments is instructive:

> Plaintiffs stress that Defendants' illegal stop not only caused Stearns
> to shoot but also created the need for the officers to use deadly force
> in responding to Stearns and thus caused Jackson's death and
> Wimbish's injuries.  Therefore, Plaintiffs argue, and we agree, that jury
> issues exist regarding whether, except for Defendants' illegal stop,
> Stearns would not have shot, the officers would not have shot back,
> and Jackson's death and Wimbish's injuries would not have occurred.

*Id.* at 1168–69.  Plaintiff's causation argument is a straight line—from law

enforcement foreseeably doing exactly as Martin requested in issuing an

indefinite Trespass Ban to Plaintiff's arrest for reasonably questioning that

unlawful order.

Viewing the facts in Coley-Pearson's favor, law enforcement drafted an

indefinite, overbroad ban because that is what Martin requested.  Martin's oral

statements to law enforcement demonstrate that her intent was to ban Coley-

Pearson in perpetuity.  Stewart understood that Martin "doesn't want [Coley-

Pearson] assisting anyone else.  And . . . she says she's gonna do whatever she

has to do to keep [Coley-Pearson] out of this building."  *Id.* at 18:30–19:00.  So he

drafted a ban that was "indefinite." Doc. 69-4.  As to geographical reach, Martin

admits she asked that it apply "to the location and any polling place."  Doc. 69-15

at 2.

Defendants simply cannot point to any discrepancy between what Martin

actually told police and the text of the Ban drafted at her behest. Drawing all reasonable inferences in Coley-Pearson's favor, the Ban's duration and geographic scope matched what Martin told officers she wanted. That officers did what she asked is plainly foreseeable. It is even more so given that Martin tellingly never read the Ban's text before it was issued, Doc. 69-16 at 2, leaving officers with only her words. A reasonable juror could thus conclude Martin is responsible for the Ban's unconstitutional reach, and summary judgment is inappropriate.

Relatedly, a reasonable jury could find that Martin caused Coley-Pearson's later arrest. The sole basis for the arrest was that Coley-Pearson did not comply with the Ban that Defendants, led by Martin, caused to issue. Plaintiff was arrested in a parking lot after driving a voter to the polls. Martin specifically affirmed that she wanted Coley-Pearson arrested. The district court's reliance on a statement claiming an "independent investigation," Doc. 106 at 81, is misplaced because there was nothing to investigate—Plaintiff was at a location "lawfully used by the board." Doc. 69-4. Thus, there was a reasonable belief she had violated Defendants' Ban. The problem is that the Ban was unlawful on its face and as applied.

## 2.    Martin is Not Entitled to Qualified Immunity

Martin argued she was entitled to qualified immunity because it "has not been clearly established that one has a constitutional right to yell and argue with election officials at polling locations." Doc. 69-2 at 19. The district court did not address qualified immunity questions related to the issuance of the Criminal Trespass Ban because it found it to be lawful. Doc. 106 at 62–63. Martin's cramped framing misses the mark, and as shown, the Ban was unlawful. Indeed, under long standing precedent, the Ban was clearly established to be unlawful for multiple independently sufficient reasons.

First, it has long been clearly established that viewpoint discrimination is unlawful. *See, e.g.*, *Rosenberger*, 515 U.S. at 828. Indeed, this Circuit has held that the right to be free from viewpoint discrimination applies "with obvious clarity . . . even though the very action in question has [not] previously been held unlawful." *Holloman*, 370 F.3d at 1278 (quotation marks omitted); *see also id.* ("Hollman had the right to be free from viewpoint discrimination, and that right was clearly established[.]"). If a jury could find Martin banned Plaintiff because of her political and expressive conduct, qualified immunity is unavailable. That inquiry into Martin's subjective motivations is for a jury, not a court.

Second, the Supreme Court and Eleventh Circuit have repeatedly and unequivocally held that unbridled discretion and prior restraint are unlawful, such that no reasonable government official could believe otherwise. *Barrett*, 872

F.3d at 1226; *Bourgeois*, 387 F.3d at 1318. Coley-Pearson's facts show no standards for disruptive conduct or for when it might be appropriate to indefinitely prohibit someone from engaging in core First Amendment activity without any judicial oversight. Those multiple layers of unbridled discretion acted as a categorical ban on Coley-Pearson's speech and expressive conduct. *See also Holloman*, 370 F.3d at 1278 ("[W]e need no longer focus on whether the facts of a case are 'materially similar to prior precedent.'").

Third, there is nothing new or novel about the fact that strict scrutiny applies to traditional public forums, such as the parking lots and sidewalks of the Board of Elections, including when no voting is taking place. *Burson v. Freeman*, 504 U.S. 191, 196 (1992). Plaintiff was barred from these areas without any justification, much less one that could survive exacting scrutiny. A categorical ban cannot survive strict scrutiny. *Cf. Crowder*, 990 F.2d at 591–92 (categorical ban cannot satisfy narrow tailoring).

And fourth, it has long been clearly established that the arbitrary silencing of speech violates the First Amendment. This Circuit's decision in *Cambridge Christian* further reconfirmed that Martin's specific conduct—banning Coley-Pearson—is precisely the kind of arbitrary, unreasonable exclusion that *Mansky* made clear is unconstitutional in a polling place. *Cambridge Christian* established that, in a nonpublic forum, singling out individual speech for exclusion (in other

54

words, permitting speech in one instance but banning the very same speech in another) without any credible explanation is "the essence of arbitrary, capricious, and haphazard—and therefore unreasonable—decisionmaking." 942 F.3d at 1244.

The Supreme Court has been clear that, at summary judgment, courts asking whether a right was clearly established must draw inferences in favor of the nonmovant. *Tolan* 572 U.S. at 657–60. Doing so here, Coley-Pearson was banned indefinitely from a broad swath of her community by Defendants that wanted to stop her from helping others vote. No reasonable American official could think that was lawful.

## <u>CONCLUSION</u>

The order granting summary judgment should be reversed, and this matter should be remanded so that a jury may resolve the disputed issues of fact.

Respectfully submitted this 26th day of January, 2024.

<table>
<tr>
<td>

*/s/ Gerald Weber*
Gerald Weber
Georgia Bar No. 744878
Law Offices of Gerry Weber, LLC
PO Box 5391
Atlanta, GA 31107
404-522-0507
wgerryweber@gmail.com

*/s/ Mark Loudon-Brown*
Mark Loudon-Brown
Georgia Bar No. 410986
Southern Center for Human Rights

</td>
<td>

*/s/ Zack Greenamyre*
Zack Greenamyre
Georgia Bar No. 293002
*/s/ Vanessa Carroll*
Vanessa Carroll
Georgia Bar No. 993425
Mitchell Shapiro Greenamyre & Funt LLP
881 Piedmont Avenue
Atlanta, GA 30309
404-812-4747
zack@mitchellshapiro.com
vjcarroll@gmail.com

</td>
</tr>
</table>

60 Walton Street NW
Atlanta, GA 30303
404-688-1202
mloudonbrown@schr.org

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Undersigned counsel certifies that this document complies with the 13,000-word limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,872 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface in 14-point Book Antiqua. The brief was prepared using Microsoft Word.

This 26th day of January, 2024.

<u>/s/ *Gerald Weber*</u>
Gerald Weber
Georgia Bar No. 744878

**<ins>CERTIFICATE OF SERVICE</ins>**

I certify that on this date I served the foregoing APPELLANT'S BRIEF by electronically filing with the CM/ECF system, which constitutes service upon all following attorneys of record under 11th Cir. Doc. 25-3(a).

This 26th day of January, 2024.

<ins>/s/ *Gerald Weber*</ins>
Gerald Weber
Georgia Bar No. 744878